UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | :    No. 22-cr-310-1 (APM) |
| | : |
| COLLIN EDWARDS a/k/a "Chills," | : |
| | : |
| Defendant. | : |

### STATEMENT OF OFFENSE IN SUPPORT OF GUILTY PLEA

I.   Summary of the Plea Agreement

Defendant Collin Edwards agrees to admit guilt and enter a plea of guilty to Counts One and Four of the Superseding Indictment, charging him with (1) Conspiracy to Distribute and Possess with Intent to Distribute 400 or More Grams of a Mixture and Substance Containing a Detectable Amount of Fentanyl and a Mixture and Substance Containing a Detectable Amount of Cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A); and (2) Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1) and (2).

In this case, the penalty for Count One is:

(A)   a term of imprisonment of not less than ten years up to life;

(B)   a fine not to exceed $10,000,000;

(C)   a term of supervised release of at least 5 years, after any period of incarceration; and

(D)   a special assessment of $100.

1

In this case, the penalty for Count Four is:

(A) a term of imprisonment of 2 years;

(B) a fine not to exceed the greater of $250,000 or twice the pecuniary gain or loss of the offense;

(C) a term of supervised release of not more than 1 year, after any period of incarceration; and

(D) a special assessment of $100.

The United States Sentencing Guideline § 5E1.2 permits the Court to impose an additional fine to pay the costs of imprisonment and any term of supervised release and/or probation.

II.  Elements of the Offenses

The essential elements of the offense of Conspiracy to Distribute and Possess with Intent to Distribute 400 or More Grams of a Mixture and Substance Containing a Detectable Amount of Fentanyl and a Mixture and Substance Containing a Detectable Amount of Cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(l), and 841(b)(1)(A) (Count One), each of which the government must prove beyond a reasonable doubt to sustain a conviction, are:

(1) An agreement existed between two or more people to distribute and possess with the intent to distribute fentanyl and cocaine;

(2) The Defendant intentionally joined in that agreement;

(3) The Defendant possessed a controlled substance;

(4) That the Defendant did so knowingly and intentionally. This means consciously, voluntarily and on purpose, not mistakenly, accidentally or inadvertently;

(5) That when the Defendant possessed the controlled substance he had the specific intent to distribute it. Distribute means to transfer or attempt to transfer to another person.

(6) That the controlled substance was a mixture and substance containing a detectable amount of fentanyl and cocaine; and

  (7)  The amount of the mixture and substance containing a detectable amount of fentanyl was 400 grams or more.

The offense of violating 21 U.S.C. § 846, by conspiring to violate federal narcotics laws, does not include as an element, the commission of an overt act in furtherance of the conspiracy. *United States v. Pumphrey*, 831 F.2d 307, 308-309 (D.C. Cir. 1987).

The essential elements of the offense of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A (Count Four), each of which the government must prove beyond a reasonable doubt to sustain a conviction, are:

  (1)  That the defendant committed the felony violation charged in Count Two, that being conspiring to commit wire fraud;

  (2)  that the defendant knowingly transferred, possessed, or used a means of identification of another person without lawful authority;

  (3)  that the defendant knew the means of identification belonged to another person; and

  (4)  that the transfer, possession, or use was during and in relation to the crime charged in Count Two.

### III. Brief Statement of the Facts

The following statement of facts does not purport to include all of the Defendant's illegal conduct. It also does not purport to be an inclusive recitation of everything that the Defendant heard, knew, or witnessed concerning the illegal activities of himself or others. It is intended to represent sufficient information for the Court to find a factual basis for accepting the Defendant's guilty plea.

Had this case gone to trial, the Government's evidence would have proven the following beyond a reasonable doubt:

### Count One

1. In or around August 2021, law enforcement, including the Federal Bureau of Investigation ("FBI"), began investigating a drug trafficking group running a fentanyl pill pressing operation in and around Washington, D.C. and Maryland. Law enforcement learned that the group possessed at least three pill presses, used to press fentanyl into counterfeit prescription pills which the group then distributed throughout Washington, D.C. and Maryland.

2. Through the investigation, law enforcement was able to identify the Defendant and others as being involved in this drug trafficking operation. The Defendant knowingly and intentionally agreed with more than one other person to participate in a conspiracy to possess with the intent to distribute various narcotics—including fentanyl and cocaine. The conspiracy started in approximately May 2020 and lasted until at least September 2022.

3. Sometime in May 2020 and lasting through late-September 2022, the conspiracy utilized at least three pill presses, including one industrial, rotary pill press, to press mixed fentanyl powder into counterfeit prescription pills. The pills were made to appear as legitimate prescription oxycodone and other prescription pills.

4. As part of the conspiracy, the Defendant and his co-conspirators operated the pill presses. The Defendant knew the object of the pill press operation, namely, to press fentanyl mixtures into counterfeit prescription pills which would be further distributed as prescription pills. On at least one occasion, when a pill press operation was discovered in Maryland by law enforcement, the Defendant caused one of the pill presses to be moved to a co-conspirator's home

4

for safe keeping until they could find a new location to set up the operation.

5. As part of the conspiracy, the Defendant distributed the counterfeit pills in a coordinated manner with co-conspirators. Such distribution included distributions of counterfeit pills to other co-conspirators and to other distributors and/or users.

6. The co-conspirators would coordinate their distribution, including resupplying or helping each other fill orders if necessary to further the object of selling narcotics, and referring customers to each other.

7. On March 29, 2022, the FBI executed a search warrant at 1346 4th Street SE, Apt. #508, Washington, D.C., a stash house used by the conspiracy to run the pill press operation. The Defendant was present at the apartment at the time of search. During the search, law enforcement seized Ziploc baggies of pills and loose powder, together amounting to more than 516 pills and more than 76 grams of a mixture and substance containing fentanyl.

8. Law enforcement also executed a search warrant on the Defendant's telephone. Law enforcement recovered countless text messages from the Defendant referencing pills for sale, prices, and large quantities.

9. For example, on October 2, 2020, Defendant Edwards and a co-conspirator exchanged the following messages:

| | |
|---|---|
| CC-1: | How much $ you owe!? |
| Edwards: | 3000 whites |
| Edwards: | 500 blues |
| Edwards: | 3000 + 7500 I'm not done yet |
| Edwards: | Its 4000 Ws |
| Edwards: | I just looked |
| Edwards: | So 4000 Ws 10k |
| | 500 blues 6000 |
| CC-1: | Okay |

10. In another interaction, on May 15, 2020, Edwards wrote to an unknown contact, "I'm over here counting out 5000 pills bro. Hold on."

11. In another exchange between Defendant Edwards and another co-conspirator, CC-2, on July 29, 2020, Edwards sent the following message, "It's like 6-700 joints left right" and CC-2 replied, "Yesssur." Edwards asked, "You counted exactly or naw" CC-2 said, "Nah I can tho." Joints is a reference to pressed fentanyl pills.

12. In one exchange from June 2, 2020, CC-2 was counting pills inventory for Edwards. Edwards wrote, "Count the rest of em for me" and CC-2 responded,"163white 203blue." Then on June 4, 2020, CC-2 wrote to Edwards, "40 blues. Countin white rn." CC-2 later texted, "354 whites." Then on June 6, 2020, Edwards wrote to CC-2, "100 white make sure they all good." CC-2 replied, "Yurp already." On June 9, 2020, Edwards asked CC-2, "How many left" and CC-2 replied, "156." Edwards wrote back, "Great. He never gave you money right" and CC-2 wrote back, "Who".

13. This arrangement appeared to extend for a time. On July 29, 2020, Edwards asked CC-2 to count the remaining pills on hand. CC-2 wrote to Edwards, "167-bag that was for Marco. 501- bag that was for you. 668- total. Lost a few but only cause they were all broken and shit so I doubt you wanted to keep those lol." This is again a reference to 668 pressed fentanyl pills.

14. The Defendant also distributed cocaine and found purchasers of cocaine for at least one of his co-conspirators.

15. The Defendant admits that he is accountable for more than 1.2 kilograms but less than 4 kilograms of a mixture and substance containing a detectable amount of fentanyl, which represents the total amount involved in the Defendant's criminal conduct, including amounts the

6

Defendant distributed or possessed with the intent to distribute and amounts distributed or possessed with the intent to distribute by the Defendant's co-conspirators pursuant to jointly undertaken criminal activity that was reasonably foreseeable by the Defendant and within the scope of the Defendant's conspiratorial agreement.

### Count Four

16. In reviewing the Defendant's phone seized on March 29, 2022, law enforcement additionally discovered evidence establishing a conspiracy to defraud multiple states of unemployment insurance ("UI") benefits through compromised personal identifiable information ("PII").

17. In reviewing Defendant's cellular telephone download, the FBI collected the PII from a series of text messages between the Defendant and a co-conspirator (over 80 victims' PII) and sent this list to the Department of Labor ("DOL"). DOL estimates that the loss incurred through this scheme is over $260,000.

18. Bank of America held the contract to issue UI benefits for numerous different states. Their records indicate that from June 24, 2020, through May 18, 2021, a total of $295,532 was posted in UI benefits connected to the names/PII shared between the Defendant and his co-conspirators. Maryland is by far the most significant victim in this scheme, suffering a loss of $214,420.

19. Beginning in at least June 2020 and continuing until at least May 2021, the Defendant and other co-conspirators agreed to submit, and did in fact submit, materially false unemployment insurance applications to the States of California, Maryland, and North Carolina for the purpose of obtaining unemployment insurance benefits.

20. The Defendant and others illegally obtained, possessed, and transferred PII for a large number of individuals throughout the United States. The detailed PII included victims' social security numbers, dates of birth, places of birth, phone numbers, and addresses. The Defendant knew that this PII belonged to other people.

21. The Defendant agreed to, and did in fact, use illegally obtained third-party PII to submit materially false unemployment insurance applications and to create fraudulent unemployment insurance user profiles.

22. The Defendant and others caused bank accounts to be created in false names and the names of the individuals whose PII had been stolen.

23. The Defendant and his co-conspirator regularly updated each other about the balance on the UI benefits bank accounts with references to the victim's name associated with each account.

24. In or around June 5, 2020, a member of the conspiracy used victim M.M's PII to apply for unemployment insurance benefits with the State of Maryland in M.M.'s name and caused the pre-loaded UI benefits debit card to be sent an address on Rutledge Court, in Severn, Maryland. Maryland in turn authorized $43,370 in unemployment insurance funds for M.M.

25. On or about June 17, 2020, a co-conspirator sent the Defendant a text message containing a full credit report for victim C.F. The document contains C.F.'s social security number, date of birth, e-mail address, birth location, and past addresses.

26. In or around June and July 2020, a member of the conspiracy used C.F.s PII to apply for unemployment insurance benefits in C.F.'s name and caused a Bank of America debit card to be issued in C.F.'s name that was pre-loaded with the fraudulently obtained unemployment

insurance benefits.

27. On July 14, 2020, a member of the conspiracy used the unemployment insurance benefits card issued in victim C.F.'s name at a CVS in the District of Columbia.

28. On July 14, 2020, a member of the conspiracy used the unemployment insurance benefits card issued in C.F.'s name at a Del Frisco's Double Eagle Steakhouse in the District of Columbia.

29. On July 8, 2020, a co-conspirator sent the Defendant a PII report for victim N.D.

30. In or around June and July 2020, a member of the conspiracy used this PII to apply for unemployment insurance benefits in N.D.'s name and caused Bank of America debit cards to be issued in N.D.'s name that were pre-loaded with the fraudulently obtained unemployment insurance benefits.

31. On September 15, 2020, a member of the conspiracy used one of the unemployment insurance benefits debit cards issued in N.D.'s name to make a $980 withdrawal at an ATM in the District of Columbia.

32. On various occasions throughout the conspiracy, the Defendant would rent automobiles or have them rented on his behalf. The Defendant would then wear a mask and wig as a disguise and drive to automatic teller machines ("ATM") for the purpose of withdrawing funds using the fraudulently obtained unemployment insurance cards.

33. In or around 2020, the Defendant agreed to, and did in fact, use third-party PII to submit materially false unemployment insurance applications and to create fraudulent unemployment insurance user profiles in the State of California as well.

34. The fraudulently obtained unemployment insurance was paid by various State

governments that issued the unemployment insurance benefits.

35.     The Defendant admits he is accountable for losses, which include actual and intended losses, of more than $250,000 but less than $550,000, which represents the total amount involved in the Defendant's criminal conduct, including losses the Defendant intended and/or did in fact cause, and losses intended to be caused and/or in fact caused by the Defendant's co-conspirators pursuant to jointly undertaken criminal activity that was reasonably foreseeable by the Defendant and within the scope of the Defendant's conspiratorial agreement.

Respectfully Submitted

MATTHEW M. GRAVES
United States Attorney

By:     _____
Kevin Rosenberg
Assistant United States Attorney
Sarah J. Rasalam
Special Assistant United States Attorney

## DEFENDANT'S ACKNOWLEDGMENT

I have read the foregoing statement of offense, and I have discussed it fully with my attorney, Andrew Clarke. I fully understand this proffer and I acknowledge its truthfulness, agree to it and accept it without reservation. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this proffer fully.

Date: 11/9/2023

_____
Collin Edwards

## ATTORNEY'S ACKNOWLEDGMENT

I have read every page constituting the government's statement of offense related to my client's guilty plea. I have reviewed the entire proffer with my client and have discussed it with her fully. I concur in my client's agreement with and acceptance of this proffer.

Date: 11/9/2023

_____
Andrew Clarke, Esq.
Counsel for Defendant